# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued October 15, 2015          Decided March 4, 2016

No. 15-3003

UNITED STATES OF AMERICA,
APPELLANT

v.

JOSEPH DANIEL HALLFORD,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cr-00335-1)

---

*David P. Saybolt*, Assistant U.S. Attorney, argued the cause for appellant. With him on the briefs were *Ronald C. Machen, Jr.*, U.S. Attorney at the time the brief was filed, *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Michael J. Friedman*, Assistant U.S. Attorneys.

*Jonathan S. Jeffress*, Assistant Federal Public Defender, argued the cause for appellee. With him on the brief was *A.J. Kramer*, Federal Public Defender.

Before: BROWN and WILKINS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Opinion dissenting in part and concurring in part filed by *Circuit Judge* WILKINS.

RANDOLPH, *Senior Circuit Judge*: A federal grand jury indicted Joseph D. Hallford for firearms offenses. The United States appeals the district court's order, issued after an evidentiary hearing, suppressing Hallford's statements to agents of the United States Secret Service, and barring the government from introducing items – loaded firearms, an incendiary device, a bullet-proof vest, military grade ammunition and other objects – recovered from the car he illegally parked near the National Mall.

There are two basic questions. Did the seizure and search of Hallford's car result from a violation of Hallford's rights under the Fifth Amendment Due Process Clause? And was Hallford in custody within the meaning of *Miranda v. Arizona*, 384 U.S. 436 (1966), when the agents interviewed him without giving *Miranda* warnings, thus rendering his statements inadmissible?

I.

Hallford left Alabama in his father's car and drove overnight to the District of Columbia so that he could be on the Mall the next afternoon, November 5, 2013, for the "Million Mask March," which turned out to be neither a march nor a million (Hallford estimated that about 100 people attended). The participants gathered in front of the White House wearing "Guy Fawkes" masks. Hallford, then 32 years old, arrived at the gathering wearing such a mask and confronted officers of the Secret Service, opening his coat to show that he was unarmed,

and demanding "Shoot me!  Shoot me!"  There is no evidence the officers responded to his provocation.

Later that day, Park Service Rangers encountered Hallford at the Korean War Memorial, near the Lincoln Memorial.  One of the Park Rangers filled out a "sick person" report stating that Hallford complained about missing his medication for hemophilia, that he appeared weak and disoriented, that he had driven to Washington from Alabama, and that he could not remember where he had parked his car.  Park Rangers called an ambulance for him but when it arrived Hallford refused to get in, "stating that he had been in this condition before and would be alright."  Instead, Hallford took a cab to find his car and, when he failed to locate it, he had the driver take him to the emergency room at George Washington Hospital.

At the hospital, Hallford complained of bleeding as a result of his hemophilia.  He stated that he had driven to the District from Alabama to participate in the "Million Mask March."  He told staff members that "he wanted to be shot by the Secret Service . . . so his parents could own the agency."  He threatened to "bash the doctor's head in" if the doctor did not give him pain medication.  He said that if he "didn't have kids, [he] would have already killed [him]self."  He also stated that "I would rather not kill people, I would rather they suffer."  He said that he wanted to "hurt the government."  Hospital personnel, understandably concerned about his remarks, decided to transfer Hallford to United Medical Center for an "involuntary psych evaluation."  *See* D.C. CODE §§ 21-521 to -522.  A doctor explained to Hallford the "rationale and need for involuntary admission."  In the meantime, a member of the hospital's security staff called the Secret Service Operations Center to report that a man named Joseph Hallford had come to the emergency room, that he was in physical pain and possibly mentally disturbed, that he said he wanted the Secret Service to

shoot him, that although he was unpredictable he tended to be "very calm," and that he was scheduled to be transferred to another facility, the United Medical Center, an agency of the D.C. government, for an "involuntary psych evaluation."

The next day, November 6, around 3 p.m., the hospital transferred Hallford to United Medical Center, a more secure facility than George Washington Hospital. Before Hallford left, hospital staff gave him pain medication and a while later he reported that the pain in his leg had subsided. Also, one of the nurses again explained to him the civil commitment order and why it had been issued. Hallford "expressed understanding" about the reasons for his temporary commitment.

Hallford's car – parked in the vicinity of the Lincoln Memorial – had been attracting the attention of the Park Service. An officer ticketed the car on November 5 for being illegally parked. The next morning, November 6, another Park Service officer placed an "abandoned vehicle" tag on the car, designating it to be towed. Later that day, still another officer ticketed the car again for a parking violation.

While Hallford was in transit to United Medical Center, Secret Service agents Brian Fox and John Maher arrived at George Washington Hospital to interview him. The agents were members of a "protective intelligence squad" charged with investigating unusual interest in Secret Service "protectees" – such as the President and Vice President. Agent Fox had conducted some 200 interviews, about half of which were of people who had "mental health issues." After learning that Hallford had already been transferred, the agents remained at George Washington Hospital to ask staff members about Hallford's statements, his behavior, and his medical condition. The agents then drove to United Medical Center. After they

arrived they joined Hallford and several medical staff members. The group then proceeded to a doctor's lounge.

Hallford took a seat at a table. The agents explained to him that they were not there to arrest him and that he was not "in trouble." Before proceeding, the agents asked if they could "speak to [him] about those statements" he made at George Washington Hospital. Hallford said "yes." (Agent Fox testified that if Hallford had said "No" they would have left.) The agents began the interview with general biographical questions, asking Hallford for his address, date of birth, his marital status and other personal information. Hallford told them he had been arrested in Alabama for writing bad checks, that he had been involuntarily committed before, and that he had abused prescription drugs. The agents asked him about his statements at George Washington Hospital. Hallford recounted what had happened over the past two days and explained that he was suffering from the effects of his hemophilia.

When the agents were satisfied that Hallford posed no threat to any Secret Service protectee, they wound down the interview with several routine questions from the Secret Service interview form. One of the questions was whether Hallford owned firearms. In response, Hallford said he had a .45 caliber handgun, a 12-gauge shotgun, and two .22 caliber rifles. When the agents asked where he had these firearms, Hallford said they were in his home in Alabama. When they asked where in his home, Hallford considered the question for a moment, possibly up to a minute, and then admitted that the firearms were in the car he had driven to the District of Columbia. Saying nothing, Agent Fox stood up and walked out to make a telephone call. While he was doing so, Hallford volunteered to Agent Maher that "there was other stuff in the vehicle that would look bad," such as a container of gasoline, bottles of propane and a Molotov cocktail, or the makings of one. Hallford added that he

kept the firearms for self-defense. The agents asked Hallford for permission to search the car when, and if, they found it and to review his medical records. Hallford refused both requests. The agents then ended the interview.

The interview lasted less than an hour. At the suppression hearing, Agent Fox testified that during the interview Hallford "was calm. He was controlled. He was generally nice at times. He smiled. He – he, you know, made a few jokes here and there." Hallford was not handcuffed. He was not physically restrained. When he mentioned that he had not eaten in days,[1] a member of the hospital staff offered him chocolate. The agents wore casual clothes, spoke in conversational tones, and did not display their badges or weapons. They did not give Hallford the standard *Miranda* warnings. They did not tell him he was free to end the interview. The door to the doctor's lounge was frequently open. Doctors and hospital staff members came and went during the interview. Outside the lounge, the hallway doors were operated with key cards.

Later that evening, police located Hallford's car on Ohio Drive just south of Independence Avenue near the Lincoln Memorial. The police searched the car and discovered Hallford's medication; a .45 caliber semi-automatic pistol; two .22 caliber rifles; a 12-gauge shotgun; copious rounds of ammunition, some of military grade; a bottle containing matches, Q-tips coated with a black substance, an assortment of

---

[1] It is unclear if Hallford had eaten nothing before his interview. The staff at George Washington Hospital reported that "Hallford ate some, but not all, of the hospital-supplied meals . . . on November 5 and 6." Hallford admitted that he was offered food but claims that he refused it. He also claimed that he had not slept on the evening of November 5 while he was at George Washington Hospital. However, the hospital records indicated that he had periods of uninterrupted sleep.

metal pieces, a live round of ammunition and a rag protruding from the bottle's top; a five gallon cannister containing gasoline; and a bulletproof vest. The firearms were loaded and operable. Later investigation disclosed that Hallford purchased them a month earlier. The firearms were not registered in the District of Columbia.

The next day, November 7, Dr. Dierich Kaiser, a United Medical Center psychiatrist, evaluated and treated Hallford. Dr. Kaiser diagnosed Hallford as having "schizoaffective disorder"[2] based on Hallford's unstable mood changes, paranoid delusions, and self-destructive behavior. Dr. Kaiser prescribed various medications and extended Hallford's commitment. *See* D.C. CODE §§ 21-522 to -523.

Based on Hallford's statements and the items found in the car, a judge issued an arrest warrant for him on November 8 and police arrested him at United Medical Center.[3] Local police informed him of his *Miranda* rights, which he refused to waive.

---

[2] *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 105-10 (5th ed. 2013).

[3] A Detention Memorandum by a magistrate judge indicated that the government "obtained a search warrant for [Hallford's] cell phone, which contained pictures of an individual posing wearing a Guy Fawkes mask with several firearms – including some of the weapons recovered from [Hallford's car]. The phone also contained a picture of another individual in a Guy Fawkes mask photoshopped as looking in the window of the Oval Office at President Obama with the text '05th November soon.'"

The magistrate judge concluded that Hallford "was prepared to engage in violence, and the fact that he ultimately did not do so is insufficient, given the level of planning and apparent focus on death, to convince me that he does not pose a danger to the community. Indeed, I am concerned that he may pose a threat to the President."

A federal grand jury indicted him for two violations of federal law and ten violations of District of Columbia law involving unlawful possession and interstate transportation of unregistered firearms, ammunition, and a destructive device. *See* 26 U.S.C. §§ 5861(d), 5841, 5845(f), 5871; 18 U.S.C. §§ 922(a)(4), 924(a)(1)(B); D.C. CODE § 22-4504(a)(1), (a-1); D.C. CODE § 7-2502.01(a); D.C. CODE § 7-2506.01.

Hallford moved to suppress his statements to Agents Fox and Maher. He claimed that his statements "were made involuntarily and in violation of *Miranda*." He further argued that, because his statements were involuntary, the physical evidence found in his car "must be suppressed as fruit of the poisonous tree." In June 2014, the court held an evidentiary hearing on the suppression motion. On December 16, 2014, the district court granted Hallford's motion to suppress both his statements and the physical evidence. In an oral bench ruling, the court found that the Secret Service agents violated Hallford's *Miranda* rights and that his statements were involuntary.[4] Two

---

[4] The court issued a written opinion on May 6, 2015, repeating its oral findings and conclusions with a few embellishments. *See United States v. Hallford*, 103 F. Supp. 3d 1 (D.D.C. 2015). The government asks us to disregard the court's written opinion because it was handed down four months after the government noted its appeal and two months after the government filed its opening brief in this court. The filing of a non-frivolous notice of appeal divests the district court of jurisdiction "over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam); *see United States v. DeFries*, 129 F.3d 1293, 1302 (D.C. Cir. 1997) (per curiam). Some courts of appeals have made exceptions to this rule, *see, e.g.*, *In re Mosley*, 494 F.3d 1320, 1328 (11th Cir. 2007); *In re Silberkraus*, 336 F.3d 864, 869 (9th Cir. 2003), but none of them fit a case in which the written opinion is issued months after the appellant has filed its brief on appeal, as occurred here and in *United States v. Martin*, 520 F.3d 87, 97-98 (1st Cir.

days later, the court ordered Hallford – who was then in the D.C. jail (*see* note 3 *supra*) – released on his own recognizance on condition that he remain in Alabama pending any appeal the government might bring.

## II.

Before we get to the question whether *Miranda* required suppression of Hallford's statements to the Secret Service agents, we will discuss whether the district court should have suppressed the physical evidence found in Hallford's car. Hallford's statements to the agents add very little to the government's case.[5]   The physical evidence is far more significant.   And the government has informed us that the prosecution could proceed without Hallford's statements if the items seized from the car are admissible.  Appellant Br. at 24 n.15.

---

2008).  We therefore will disregard the written opinion, which adds little to the district court's oral explanation.  Still, we do not entirely foreclose the possibility that in some future case other circumstances may warrant consideration of a district court's post-appeal opinion.

[5] In a memorandum opposing Hallford's suppression motion, the government relied on *Nix v. Williams*, 467 U.S. 431, 448 (1984), to argue that it would inevitably have discovered the car and its contents even if Hallford had not made his statements to the agents: the car in fact had already been discovered (by the Park Service); it had been ticketed twice and was designated for towing; and once a car is impounded, an inventory search is undertaken of the passenger compartment and the trunk.  At the suppression hearing, however, the government declined to submit evidence in support of its inevitable discovery argument and the parties apparently treated the issue as "off the table."

The Supreme Court, adopting a position Judge Friendly advocated long ago,[6] has determined that the fruit-of-the-poisonous-tree doctrine, *see Wong Sun v. United States*, 371 U.S. 471, 484-87 (1963), does not apply to statements taken in violation of the *Miranda* rules. *See Oregon v. Elstad*, 470 U.S. 298, 304-09 (1985); *United States v. Patane*, 542 U.S. 630, 634 (2004) (Thomas, J., joined by Roberts, C.J., and Scalia, J.); *id.* at 644-45 (opinion of Kennedy, J., joined by O'Connor, J., concurring in the judgment). As Justice Thomas explained in *Patane*, 542 U.S. at 636, "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly, there is no justification for extending the *Miranda* rule to this context."[7] It follows that unless the agents, in violation of the Due Process Clause, coerced Hallford into stating that his car contained a Molotov cocktail and firearms (which may have accelerated the seizure of the car and its contents), the items found in the car were admissible. *See Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion).[8]

---

[6] *See* HENRY J. FRIENDLY, *A Postscript on Miranda*, *in* BENCHMARKS 266, 279-82 (1967).

[7] The Fifth Amendment's privilege against self-incrimination states that "No person . . . shall be compelled in any criminal case to be a witness against himself . . .." U.S. CONST. amend. V.

[8] The plurality opinion in *Patane*, 542 U.S. at 640, quoted this statement from *Chavez* (538 U.S. at 769): "those subjected to coercive police interrogation have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial."

In determining whether the agents coerced Hallford into making these incriminating statements, a court must consider "the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).[9] The ultimate question is whether Hallford's "will" was "overborne and his capacity for self-determination critically impaired" as a result of the agents' conduct. *Id.* at 225-26 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). The district court's determination that the agents violated Hallford's Due Process rights rested on three critical findings of fact. The government argues that each of these findings constituted clear error. *See United States v. Reed*, 522 F.3d 354, 358 (D.C. Cir. 2008).

The first of these findings was, in the words of the district court, that Hallford "was summoned by agents for an interview, not asked if he would submit to an interview." The record shows otherwise. Before beginning the interview, Agent Fox asked Hallford, "can we speak to you about [your] statements . . .?" Hallford said "yes." Hallford defends the district court's finding on the ground that his agreeing to let the agents "speak *to*" him did not mean he consented to speak to them. Appellee Br. at 31. This is clever but not cogent. Hallford must have understood the agents to be requesting his permission to engage in a conversation. Not only did the agents tell him they wanted to "find out" about his statements, but also Hallford answered

---

[9] We hesitate to put this in terms of the "totality of the circumstances," a phrase that appears in some opinions dealing with the sort of issues confronting us in this case. Sometimes these opinions treat the "totality" phrase as if it were a "test," which it is not. The phrase itself is "non-descriptive." *United States v. Prandy-Binet*, 5 F.3d 558, 559 (D.C. Cir. 1993) (on pet. for reh'g). It tells us nothing about which circumstances are even relevant (surely, not all circumstances matter), and it reveals nothing about the probative value of any particular circumstance.

their questions.  There was no evidence that the agents were coercive or overbearing in asking his permission.  The district court's finding was clearly erroneous.

The district court also found that the agents "did not know and hadn't even tried to find out [Hallford's] mental and physical well-being, notwithstanding the fact that they knew he was suffering from a mental disorder, extreme anxiety, and serious physical ailments."  The court added that the agents "didn't even attempt to appreciate the nature of his hemophilic condition" and the "severe pain" he was experiencing.  There is evidence that Hallford was in pain when he took himself to the George Washington Hospital emergency room on November 5, but there is no evidence supporting the district court's apparent assumption that Hallford was still in pain, severe or otherwise, by the time the agents interviewed him on the afternoon of November 6 at United Medical Center.  Before he was transferred, staff at George Washington Hospital administered pain medicine to him; thereafter, Hallford told the doctors and nurses that the pain in his leg had subsided.  So what evidentiary support is there for the district court's conclusion that the agents failed to "appreciate" Hallford's pain during the interview? We see none.  During his interview Hallford said nothing and exhibited nothing that would support the court's finding.  All indications are to the contrary.  As to the court's finding that the agents were remiss in attempting to learn about Hallford's condition, there is abundant evidence to the contrary.  The agents did, in fact, ask and learn numerous details about Hallford's condition.  After discovering that he had already been transferred to United Medical Center, the agents stayed at George Washington Hospital to ask staff members about Hallford.  The agents learned that when he arrived at the emergency room his leg was bleeding, that he suffered from a blood disorder, that he had abused antidepressants, that he had expressed paranoid delusions about the government, and that the

hospital staff determined that he should be involuntarily committed because he appeared to pose a "danger to [himself] or others . . .."[10]  Later, at United Medical Center, the agents observed Hallford's condition first hand.  Far from "not know[ing]" or "tr[ying] to find out [Hallford's] mental and physical well-being," the agents diligently inquired into, and learned a great deal about, both.  The district court clearly erred in its finding of fact.

Third, the district court found that the agents deceived Hallford and "snooker[ed him] into an admission of gun possession . . .."  Significant police deception may bear on whether a statement or confession has been coerced, *see Lynumn v. Illinois*, 372 U.S. 528, 534 (1963), but the agents here engaged in neither deception nor trickery.  When they began the interview, the agents asked Hallford if he would answer questions "about [his] statements" to the staff at George Washington Hospital and "in reference to [those] statements . . .."  As the interview concluded, the agents followed Secret Service protocol, asking generic questions they ask every interviewee.  One of the questions was about Hallford's ownership of firearms.  This amounted to deception, according to the district court.  We do not see why.  If the agents already knew, or even just suspected, that Hallford's car contained firearms, there is no explaining why they did not put out an alert to find his car before their interview even began.  But there is no

---

[10] District of Columbia law permits a "physician or qualified psychologist . . . who has reason to believe that a person is mentally ill and, because of the illness, is likely to injure himself or others if he is not immediately detained," to, "without a warrant, take the person into custody, transport him to a public or private hospital . . . and make application for his admission thereto for purposes of emergency observation and diagnosis" for up to 48 hours.  D.C. CODE § 21-521.  Detention may be extended for up to an additional seven days by court order.  *See id.* at § 21-522 to -523.

evidence whatsoever that the agents believed, or had any reason to believe, that Hallford owned firearms, much less that he had any with him in the District. There is no evidentiary basis for the district court's clearly erroneous finding of deception and trickery.

With these findings corrected, we cannot accept the district court's conclusion that Hallford's statements about the items in his car resulted from a "substantial element of coercive police conduct." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). Hallford agreed to the interview. The agents did not pressure him to do so in any way. The interview lasted less than an hour. The setting was not, as in *Miranda* for example, *see* 384 U.S. at 448-58, in a police-dominated atmosphere. The agents asked straightforward questions in conversational tones, the hospital staff offered him food, and, in general, the agents "treat[ed] him nicely," according to a defense-retained psychiatrist who evaluated Hallford six months later. *See United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011). The agents made no threats or promises to Hallford and he was deprived of no essentials. *See Culombe*, 367 U.S. at 602. The district court mentioned that "the agents never did anything to dispel [Hallford's] belief . . . that the interview was required, and that if he was going to leave that hospital, he would need their blessing." This of course assumes that Hallford had such a belief, which the district court said may be "true or not."[11] Nothing the agents did or said would have caused Hallford to entertain such a belief, if in fact he entertained it. And nothing Hallford did or said suggested to the agents that he was thinking

---

[11] Dr. John S. O'Brien II, a psychiatrist the defense retained to evaluate Hallford six months after the interview, testified that in his "opinion" Hallford thought the agents "were his ticket out [of United Medical Center]." One wonders how this statement qualifies as a medical diagnosis or a medical opinion. As stated in the text, the district court did not accept Dr. O'Brien's opinion as fact.

they were his ticket out of the hospital.[12] The agents were generally aware of Hallford's physical and mental condition before they interviewed him. The district court stated that Hallford arrived at George Washington Hospital in "severe pain" but neglected to mention that there was no evidence he was still in pain when the agents interviewed him a day later. Hallford did have psychiatric problems. Even so, "a defendant's mental condition, by itself and apart from its relation to official coercion," cannot "dispose of the inquiry into constitutional 'voluntariness.'" *Connelly*, 479 U.S. at 164. The federal charges in this case related to the Molotov cocktail found in the car, yet Hallford's statement to the agents about this was unsolicited. That is, Hallford volunteered the information when no question was pending. And there is strong evidence that Hallford's will was not "overborne." *Schneckloth*, 412 U.S. at 226. As the interview concluded, Hallford refused the agents' request that he consent to a search of the car and he refused to permit the agents to examine his medical records.

In short, we believe the government carried its burden of proving by a preponderance of the evidence that Hallford's statements were voluntary within the meaning of the Due Process Clause. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972).

---

[12] All indications are that Hallford "perceive[d] this detention as imposed only for purposes of a medical examination, not a police interrogation." *Wilson v. Coon*, 808 F.2d 688, 690 (8th Cir. 1987); *see also United States v. Jamison*, 509 F.3d 623, 629-32 (4th Cir. 2007). It was the decision of the George Washington medical staff to commit him. A doctor, and later a nurse, explained this to him. He said he understood. He was transported from George Washington Hospital to United Medical Center by medical staff in an ambulance. In these circumstances, it is hard to see why during the interview Hallford would have had "reason to think that the listeners have official power over him . . .." *Howes v. Fields*, 132 S. Ct. 1181, 1191 (2012) (quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)).

It follows that the district court erred in suppressing physical evidence derived from his statements.

IV.

This brings us to the district court's finding that Hallford was "in [*Miranda*] custody" when the agents interviewed him. Because we have rejected the critical factual underpinnings for the district court's *Miranda* finding, we do not believe the record is sufficient for us to decide the issue. Determining "whether a defendant was in custody for purposes of *Miranda*" is a "fact intensive" inquiry. *United States v. Bautista*, 145 F.3d 1140, 1146 (10th Cir. 1998); *see Thompson v. Keohane*, 516 U.S. 99, 118 (1995) (Thomas, J., dissenting) ("The *Miranda* custody inquiry . . . requires . . . any number of fact-intensive, close calls." (internal quotation marks omitted)). Rather than attempting to weigh the evidence, we remand the case to the district court to determine whether Hallford was in *Miranda* custody. *See, e.g.*, *United States v. Chase*, 179 F. App'x 57, 58 (D.C. Cir. 2006) (remanding to consider whether a "[*Miranda*] interrogation took place").

The district court found that Hallford was "not asked if he would submit to an interview" and then focused on the conditions of Hallford's involuntary commitment to conclude that his "freedom of movement" was sufficiently "restrain[ed]" to implicate *Miranda*. *See Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). As to the court's factual finding, we have already held that it was clearly erroneous. As to Hallford's involuntary commitment, this was "simply the first step in the analysis, not the last." *Id.* Not all mandatory hospitalizations are tantamount to *Miranda* custody. *See, e.g.*, *Reinert v. Larkins*, 379 F.3d 76, 86 (3d Cir. 2004) (holding that a suspect was not in custody even though he was interrogated in an ambulance and was "never told that he was free to leave or free not to answer

questions"); *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (holding that a suspect was not in custody even though "questioning . . . took place at the hospital" and he was "not free to leave"). Indeed, "not all police questioning is coercive," and in many interrogations "there will be nothing that could fairly be called compulsion . . .." HENRY FRIENDLY, *A Postscript on Miranda*, *in* BENCHMARKS at 274. On remand, the district court should take care to answer "the additional question whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 132 S. Ct. at 1190.

## V.

Accordingly, the district court's judgment suppressing the physical evidence found in the car Hallford drove to the District is reversed and case is remanded for the district court to reconsider *Miranda*'s applicability.

*So ordered.*

WILKINS, *Circuit Judge*, dissenting in part and concurring in part:  I must depart from the Court's opinion concluding that three of the District Court's factual findings were clearly erroneous, but I agree that the Government has proven that Hallford's statements were voluntary under the Fifth Amendment's Due Process Clause.

The Court's opinion ably lays out the sequence of events that led to Hallford's interaction with Secret Service Agents Fox and Maher (collectively "the agents"), and I need not repeat that background here.  However, the Court's focus solely on the evidence that undermines the District Court's factual findings represents, in my respectful view, its failure to adhere to the deferential standard of review we employ when evaluating a District Court's factual findings.  After all,

> A trial court's findings of fact are entitled to a presumption that they are correct, and we will displace them only if (1) the findings are "without substantial evidentiary support or . . . induced by an erroneous application of the law"; or if (2) "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed."

*United States v. Dillon*, 738 F.3d 284, 297 (D.C. Cir. 2013) (alteration in original) (quoting *Cuddy v. Cameron*, 762 F.2d 119, 124 (D.C. Cir. 1985)).  Accordingly, "we may not reverse a trial court's factual findings 'even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.'"  *Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).  "In evaluating a challenge to a district court's factual findings, 'we do not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole.'"  *Id.* at 424 (quoting *Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010)).  Considering this

deferential standard of review, I cannot conclude that the District Court clearly erred in finding that the agents summoned Hallford for an interview, that the agents used deception in conducting their interview, or that the agents did not dispel Hallford's belief that the interview was necessary for his release.[1]

Take, for instance, the District Court's finding that Hallford "was summoned by agents for an interview, not asked if he would submit to an interview." A. 685.[2] Considering all the evidence, taken as a whole, the District Court's finding is not clearly erroneous. The majority relies on Agent Fox's asking Hallford if the agents could speak to him about statements he made at George Washington Hospital ("GW"). Maj. Op. at 12. However, Agent Fox's testimony also reveals that although United Medical Center ("UMC") personnel escorted Hallford to the interview, the personnel did so only upon the agents' request:

> Q. What did you do when you got to United Medical?
> A. We parked out front. We walked in, again, to the visitors' lounge, to the check-in desk, and identified ourselves to the clerk at the desk.
> Q. What happened?
> A. We identified ourselves. We explained why we were there. And they reached out to the security department.

---

[1] I concur with my colleagues that the District Court clearly erred in finding that the agents did not ascertain Hallford's physical condition for the reasons stated in the majority opinion. *See* Maj. Op. at 12-13.

[2] The use of "A." throughout this opinion indicates citation to the Appendix for Appellant.

> Q. Did you ask to interview Mr. Hallford?
> A. Yes.
> Q. And did they indicate in any way that they were going to try to make that happen?
> A. They told us that they would reach out to the security department and -- and that if we just waited there, that they would -- someone would be there to assist us.

A.196. Thereafter, UMC security officers escorted the agents to a secure area of the fourth floor of the hospital where they subsequently entered a hallway. Agent Fox explained their entry in this manner: "We went into the hallway and, as we went into the hallway, there was an open door in front of us, and a hospital staff person was standing there, and then in walked two or three hospital staff, along with Mr. Hallford." A. 197. The hallway was not patient accessible. Furthermore, Agent Fox's testimony suggests that UMC personnel deferred to the agents because "[t]hey just looked at [the agents] and said . . . do you want to go in this room right here? And [the agents] just followed. [The agents] said, okay." A. 197. Agent Fox was the last person to enter the interview room. There was no evidence regarding what language the UMC personnel used in escorting Hallford to the interview. Finally, Agent Fox never informed Hallford that he was free to leave or that he was free to terminate the interview. Taking all this evidence as a whole, I am not left with the "definite and firm conviction" that the District Court erred in concluding that the agents summoned Hallford for an interview. *Dillon*, 738 F.3d at 297 (quoting *Cuddy*, 762 F.2d at 124).

The District Court also found that Hallford "fell into [the agents'] trap," A. 688, and that the agents "effectively snooker[ed] [him] into an admission of gun possession in the

District of Columbia, after satisfying themselves that he was no threat to anyone protected by the US Secret Service or any of its employees," A. 692. The District Court concluded that the questions were "calculated to possibly result in a self-incriminating admission about gun ownership and the whereabouts of those guns." A. 688.

Agent Fox testified that the agents asked Hallford if they could speak to him about the statements he made while at GW. The agents planned their questioning around a use of a standard form that touched on information of interest to the agents, including weapon ownership. As a result, near the end of the interview, the agents asked Hallford if he owned any weapons. The agents' reliance on a standard form suggests that they knew in advance that they would ask questions of Hallford about topics other than the statements Hallford made at GW. Accordingly, there is substantial evidence to support the District Court's finding that the agents used deception in questioning Hallford.

Additionally, the District Court also found there was "no question that the agents never did anything to dispel any belief on [Hallford's] part that the interview was required, and that if he was going to leave that hospital, he would need their blessing." A. 690. The majority appears to implicitly reject this finding by dismissing its import, relying on the District Court's equivocation about whether Hallford actually possessed this belief. *See* Maj. Op. at 15. However, the District Court heard testimony from Dr. John O'Brien, who was tendered without objection as an expert in the field of forensic psychiatry, and his expert report was admitted by the court. Dr. O'Brien testified that Hallford "was an individual who perceived that the Secret Service would help him get out of the hospital. Obviously he wanted to leave the next day himself." A. 482. Dr. O'Brien also testified that Hallford

"was significantly vulnerable to being seduced into speaking with him thinking that they were his ticket out," particularly in light of "the recurrently and consistently documented psychiatric symptoms he was exhibiting, his physically debilitated state and the fact that he had not yet been afforded appropriate psychiatric treatment." A. 482-83. Nothing in the record disputes Dr. O'Brien's conclusion. The government did not object to Dr. O'Brien's testimony at the time it was proffered, nor does the Government challenge whether Hallford possessed this belief. There is no evidence in the record that the agents did anything to dispel such a belief. Given the evidence as a whole, and the lack of any challenge by the Government, I cannot conclude that the District Court's finding is clearly erroneous.

Despite my conclusion that three of the District Court's findings were not clearly erroneous, I agree with the Court that Hallford's statements were voluntary. Whether a confession is voluntary is a legal question we review *de novo*. *United States v. Reed*, 522 F.3d 354, 358 (D.C. Cir. 2008). The Government must prove that Hallford's confession was voluntary by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). Although this is a close case, I believe the Government has done so here.

"A confession is inadmissible as a matter of due process if under the totality of the circumstances it was involuntarily obtained . . . ." *Reed*, 522 F.3d at 358-59 (quoting *United States v. Bradshaw*, 935 F.2d 295, 299 (D.C. Cir. 1991)). "Voluntariness turns on whether the 'defendant's will was overborne' when he gave his statement, and the test for this is whether the statement was a 'product of an essentially free and unconstrained choice by its maker.'" *United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973);

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). A defendant's mental condition is a relevant factor in determining whether a confession was voluntary, but "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). Accordingly, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Id.* at 167. Coercive activity includes "trickery, psychological pressure, or mistreatment." *Withrow v. Williams*, 507 U.S. 680, 708 (1993) (O'Connor, J., concurring in part and dissenting in part). Furthermore, whether *Miranda* warnings were given is a relevant factor but "does not . . . dispense with the voluntariness inquiry." *Dickerson v. United States*, 530 U.S. 428, 444 (2000). "Determination of whether a statement is involuntary 'requires more than a mere color-matching of cases.' It requires careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978) (quoting *Reck v. Pate*, 367 U.S. 433, 442 (1961)). Thus, we must consider "both the characteristics of the accused and the details of the interrogation." *Dickerson*, 530 U.S. at 434 (quoting *Schneckcloth*, 412 U.S. at 226). Relevant factors include "the defendant's age and education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning." *Murdock*, 667 F.3d at 1305-06 (citing *Schneckloth*, 412 U.S. at 226).

A review of our precedent prevents me from concluding that Hallford's statements were involuntary. We have suggested that "egregious facts [are] necessary to establish that the statements . . . made during questioning [are] involuntary." *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012). Statements made where the circumstances

are less than "egregious" are usually voluntary.  For example, in *United States v. Reed*, we found a confession voluntary where the defendant claimed to be suffering withdrawal symptoms at the time of the interrogation and the police placed the defendant in a jumpsuit without any underwear. 522 F.3d 354, 358-59 (D.C. Cir. 2008).  Likewise, we found a *Miranda* waiver voluntary in *United States v. Yunis*, where the defendant was questioned over a period of four days, suffered from seasickness in a "hot and cramped detention room," and lacked any familiarity with his *Miranda* rights prior to being informed and signing a written waiver.  859 F.2d 953 (D.C. Cir. 1988).  In *Berghuis v. Thompkins*, the Supreme Court noted that there is nothing "inherently coercive" about an interrogation that lasts three hours while a defendant sits in a straight-backed chair to render involuntary statements given subsequent to a *Miranda* warning.  560 U.S. 370, 387 (2010).

Similarly, where the Supreme Court has found statements involuntary, the circumstances surrounding the interrogation have been much worse than those here.  In *Mincey v. Arizona*, the defendant was suffering "unbearable" pain from a gunshot wound while unable to speak because of a tube in his mouth; he also could not provide coherent answers to questions, and he asked for a lawyer repeatedly over the course of a four-hour interrogation.  437 U.S. at 396-401.  In *Blackburn v. Alabama*, the defendant endured an eight- to nine-hour interrogation in a small room surrounded by three police officers and "was insane and incompetent at the time he allegedly confessed."  361 U.S. 199, 204, 207 (1960). Hallford's circumstances do not come close to those of *Mincey* and *Blackburn*.  Although Hallford was suffering from mental illness, he was interrogated in the company of doctors and nurses.  His interview lasted less than an hour, and the agents spoke to Hallford in conversational tones.

Hallford appeared calm and exhibited no signs of physical or emotional distress. He provided responsive answers to the agents' questions. And the coercive conduct here does not suggest that the agents "threated or injured [Hallford] during the interrogation or that he was in any way fearful." *Berghuis*, 560 U.S. at 386. "Indeed, even where interrogations of greater duration were held to be improper, they were accompanied . . . by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats." *Id.* at 387. While such circumstances may not be necessary to find a due process violation, there are no sufficiently analogous circumstances present here.

Certainly, the circumstances of this case give me pause, and although the voluntariness determination is "more than a mere color-matching of cases," *Mincey*, 437 U.S. at 401 (citing *Reck*, 367 U.S. at 442), precedent must nonetheless guide our decision-making. This is a problem for Hallford, because notably absent from his brief are cases where courts found statements involuntary under sufficiently analogous facts. While some circumstances here weigh against the government's claim that Hallford's statements were voluntary, none evoke the kind of egregious conduct or governmental coercion that has led prior courts to find statements involuntary. The agents did not inform Hallford of his *Miranda* rights, but this failure is not outcome determinative. *See Dickerson*, 530 U.S. at 444. Although the agents misled Hallford about the scope of their questioning, their misrepresentation was not the type of false promise of leniency that may render statements involuntary. *See Murdock*, 667 F.3d at 1307. *But cf. Colorado v. Spring*, 479 U.S. 564, 576-77, 577 n.8 (1987) (reserving the question of whether an affirmative misrepresentation about the scope of an interrogation would render a *Miranda* waiver involuntary).

9

The manner in which Hallford was brought to be questioned is also disconcerting – the hospital staff were acting at the will of the agents, there is no evidence that the staff asked Hallford if he wished to meet the agents, and Hallford was suffering from mental illness – but his mental illness, "by itself and apart from its relation to official coercion" does not determine whether his statements were voluntary. *Connelly*, 479 U.S. at 164. And while Hallford may have believed that the agents who arrived to question him about his prior statements would be able to help secure his release if only he would talk to them, there is no evidence in the record that the agents caused this belief, only that they benefited from it.

Finally, and most tellingly, when the agents asked if they could search Hallford's car and review his medical records, Hallford declined. As the government argues, Hallford's refusal to consent to these searches undermines any suggestion that his will was "overborne" at the time he spoke with the agents. *See United States v. Cooper*, 499 F.2d 1060, 1064 & n.11 (D.C. Cir. 1974) (concluding statements were voluntary, in part, because defendant "exercised some of his rights by refusing to sign [a *Miranda* waiver] and by indicating he might decline to answer some questions"); *see also United States v. Khan*, 461 F.3d 477, 497 (4th Cir. 2006) (statements voluntary, in part, because defendant "freely answered some questions and declined to answer others); *United States v. Graham*, 982 F.2d 273, 275 (8th Cir. 1992) (evidence "not reflective of an overborne will" when defendant, during a search, "answered some questions" but "dodged questions about her identity" and "refused officers' request to search her luggage"); *cf. Yunis*, 859 F.2d at 963 (noting that courts "look to a defendant's behavior to determine the extent of his distress" when determining whether statements are voluntary). Under the totality of the circumstances, and in light of this precedent, I conclude that

the Government has met its burden to prove that Hallford's statements were voluntary by a preponderance of the evidence.

However, given the majority's conclusion that the District Court's findings were clearly erroneous, I agree that we should remand the remaining *Miranda* question back to the District Court.