# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 15, 2017        Decided June 15, 2018

No. 17-5049

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
AND MELANIE T. SLOAN,
APPELLANTS

v.

FEDERAL ELECTION COMMISSION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-02038)

*Stuart C. McPhail* argued the cause for appellants. With him on the briefs was *Adam J. Rappaport*.

*Paul M. Smith* was on the brief for *amicus curiae* Campaign Legal Center and Dēmos in support of appellants.

*Jacob S. Siler*, Attorney, Federal Election Commission, argued the cause for appellee. With him on the brief were *Kevin Deeley*, Associate General Counsel, and *Harry J. Summers*, Assistant General Counsel. *Greg J. Mueller*, Attorney, entered an appearance.

Before: KAVANAUGH and PILLARD, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Dissenting opinion filed by *Circuit Judge* PILLARD.

RANDOLPH, *Senior Circuit Judge*: This is an appeal from the district court's grant of summary judgment in favor of the Federal Election Commission. Petitioners are Citizens for Responsibility and Ethics in Washington (CREW), and its executive director, Melanie Sloan, a registered voter in the District of Columbia. They brought this action[1] alleging that the Commission acted "contrary to law" in 2015 when it dismissed their administrative complaint against an unincorporated association whose name is too cumbersome to condense.[2] CREW's charges against the association, filed in 2011, were that the association had violated the federal election laws in 2010.

In the district court, and now in this court, CREW invoked the judicial review provision of the Federal Election Campaign Act, or "FECA" as it is sometimes called. The provision states that the district court "may declare that the dismissal of the complaint . . . is contrary to law," and, if the Commission fails to correct the illegality on remand, the "complainant may bring"

---

[1] CREW and Sloan mislabeled their pleading a "Complaint for Injunctive and Declaratory Relief." The Administrative Procedure Act, 5 U.S.C. § 703, required the "form of proceeding for judicial review" to be the special statutory review relating to Commission dismissals of complaints—namely, a "petition" filed in the district court. 52 U.S.C. § 30109(a)(8)(A). *See FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 31 & n.3 (1981).

[2] The Commission on Hope, Growth, and Opportunity.

an action in its own name against the alleged violator "to remedy the violation involved in the original [administrative] complaint." 52 U.S.C. § 30109(a)(8)(C).

CREW's petition in the district court also invoked the Administrative Procedure Act. The APA, enacted in 1946, states that a later statute—FECA is one—"may not be held to supersede or modify . . . chapter 7 . . . except to the extent that it does so expressly." 5 U.S.C. § 559. APA Chapter 7 contains the APA's judicial review provisions. *See* 5 U.S.C. §§ 701–706. Rather than "expressly" contradicting those provisions, FECA is consistent with them. FECA's "contrary to law" formulation, for example, reflects APA § 706(2)(A), which requires the court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .."[3] We will have more to say about APA § 706 later in this opinion.

The Commission's dismissal of CREW's complaint constituted the "agency action" supporting the district court's jurisdiction. S*ee* 52 U.S.C. § 30109(a)(8)(A). After the Commissioners voted 3 to 3 on whether to begin enforcement proceedings, the Commission closed the administrative file on the case. The deadlock meant that the Commission could not proceed: under FECA, the Commission may pursue enforcement only upon "an affirmative vote of 4 of its members." 52 U.S.C. § 30109(a)(2), (a)(4)(A)(i), (a)(6)(A).

The district court held that the Commission's explanation of its failure to prosecute was a "rational exercise of

---

[3] In *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986), the court repeated this language from the APA, stating that the Commission would have acted "contrary to law" if its dismissal of a complaint "was arbitrary or capricious, or an abuse of discretion." *See also Hagelin v. FEC*, 411 F.3d 237, 242 (D.C. Cir. 2005).

prosecutorial discretion." *Citizens for Responsibility and Ethics in Washington v. FEC*, 236 F. Supp. 3d 378, 397 (D.D.C. 2017). This raises a question: how can a court attribute to "the Commission" any particular rationale when the Commissioners were evenly split? The answer comes from *Democratic Congressional Campaign Committee v. FEC*, 831 F.2d 1131 (D.C. Cir. 1987), and its expansion in *Common Cause v. FEC*, 842 F.2d 436 (D.C. Cir. 1988). Together, these cases establish two propositions of circuit law. The first is that if the Commission fails to muster four votes in favor of initiating an enforcement proceeding, the Commissioners who voted against taking that action should issue a statement explaining their votes. *Common Cause*, 842 F.2d at 449. The second is that, for purposes of judicial review, the statement or statements of those naysayers—the so-called "controlling Commissioners"—will be treated as if they were expressing the Commission's rationale for dismissal, a rather apparent fiction raising problems of its own.[4] *Id.*

Here, the three Commissioners who voted not to begin enforcement proceedings issued a joint statement explaining their votes.[5] These Commissioners were concerned that the

---

[4] For instance, what if the three Commissioners each expressed a different reason for voting against enforcement proceedings? One Commissioner may have believed that FECA did not cover the activities alleged in the complaint. Another may have believed that the evidence of a violation was too weak. The third Commissioner may have concluded that the alleged violations were too trivial to warrant the Commission's attention.

[5] About the same time, two of the Commissioners who voted to proceed with enforcement issued a joint statement of their own. The third Commissioner who voted to proceed issued his statement of reasons on March 21, 2016, nearly four months after CREW filed its complaint in the district court. An agency cannot *sua sponte* update the administrative record when an action is pending in court. *See, e.g.*,

statute of limitations had expired or was about to; that the association named in CREW's complaint no longer existed; that the association had filed termination papers with the IRS four years earlier; that it had no money; that its counsel had resigned; that the "defunct" association no longer had any agents who could legally bind it; and that any action against the association would raise "novel legal issues that the Commission had no briefing or time to decide." For these reasons, the "case did not warrant further use of Commission resources."

In short, these Commissioners would have exercised the agency's prerogative not to proceed with enforcement. There is no doubt the Commission possesses such prosecutorial discretion. Although today "prosecutorial" usually refers to criminal proceedings, it was not always so. Under the APA, agency attorneys who bring civil enforcement actions are engaged in "prosecuting functions," 5 U.S.C. § 554(d). *See 3M Co. v. Browner*, 17 F.3d 1453, 1456–57 (D.C. Cir. 1994). The Supreme Court has recognized that federal administrative agencies in general, *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), and the Federal Election Commission in particular, *FEC v. Akins*, 524 U.S. 11, 25 (1998), have unreviewable prosecutorial discretion to determine whether to bring an enforcement action. *See CREW v. FEC*, 475 F.3d 337, 340 (D.C. Cir. 2007).[6]

Peter L. Strauss, Citizens to Preserve Overton Park v. Volpe—*of Politics and Law, Young Lawyers and the Highway Goliath, in* Administrative Law Stories 259, 322 (2006); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 422 (1971) (Black, J., dissenting). We have refused to consider a district court's opinion issued while the case was pending on appeal and after appellate briefs had been filed. *See United States v. Hallford*, 816 F.3d 850, 855 n.4 (D.C. Cir. 2016).

[6] The dissent thinks the Supreme Court held in *Akins* that FECA cabins "the agency's exercise of prosecutorial discretion at

As to an agency's prosecutorial discretion, *Heckler v. Chaney* is the leading case. *Chaney* interpreted APA § 701(a)(2), which bars judicial review of agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Under § 701(a)(2), "certain categories of administrative decisions are unreviewable," among which are "agency decisions not to institute enforcement proceedings." *Secretary of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006). In a frequently quoted passage, which is set forth in the margin,[7] the Supreme Court recited many of the reasons why an

---

various decisional stages." Dis. Op. 5–6. That is not correct. The only issue the Court decided in *Akins* dealt with standing. The Federal Election Commission issued an interpretation of § 431(4)(A) of FECA to dismiss one of two charges in a complaint. (The Commission, relying on *Heckler v. Chaney*, invoked prosecutorial discretion to dismiss the other charge, which alleged a violation of § 441b of FECA; this Commission action was not at issue in the Supreme Court. *See* 524 U.S. at 25; *Akins v. FEC*, 736 F. Supp. 2d 9, 13–15 (D.D.C. 2010).) The Court held only that the complainants had standing even though, on remand, the Commission might invoke its prosecutorial discretion to dismiss the remaining charge, as it had done with respect to the § 441b allegation. 524 U.S. at 25.

[7] *Chaney*, 470 U.S. at 831–32:

> [A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing.

agency's exercise of its prosecutorial discretion cannot be subjected to judicial scrutiny. At this point in its *Chaney* opinion, the Court added a caveat. An agency's decision not to undertake enforcement "is only presumptively unreviewable; the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Chaney*, 470 U.S. at 832–33; *see also Webster v. Doe*, 486 U.S. 592, 600 (1988) ("§ 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based . . ..").

*Chaney* controls this case. The three naysayers on the Commission placed their judgment squarely on the ground of prosecutorial discretion. Nothing in the substantive statute overcomes the presumption against judicial review. FECA provides that "the Commission may, upon an affirmative vote of 4 of its members, institute a civil action . . .." 52 U.S.C. § 30109(a)(6)(A). To state the obvious, the word "may" imposes no constraints on the Commission's judgment about whether, in a particular matter, it should bring an enforcement action. Nor do the adjacent sections directing that the

> The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.

*See also Wayte v. United States*, 470 U.S. 598, 607 (1985):

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

Commission "shall" take specific actions after making certain threshold legal determinations. 52 U.S.C. § 30109(a)(2), (a)(4)(A)(i). Neither of those sections constrain the Commission's discretion whether to make those legal determinations in the first instance. The consequence is that the operative "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830.

Rather than confronting *Chaney* and the many other cases applying § 701(a)(2), CREW sweeps these precedents off the table. With the way thus cleared, it argues that whenever the Commission exercises its prosecutorial discretion to decline an enforcement action, it acts "contrary to law." Implicit is the idea that even if the Commission's exercise of prosecutorial discretion is immune from judicial questioning, this does not close the door. Instead, it triggers FECA's "citizen-suit" provision, which entitles a private entity to bring an enforcement action when the Commission has declined to do so. 52 U.S.C. § 30109(a)(8)(C).

CREW's argument contradicts the principle that an agency's exercise of prosecutorial discretion is not subject to judicial review. It contradicts this principle because a court may not authorize a citizen suit unless it first determines that the Commission acted "contrary to law" under FECA or under the APA's equivalent "not in accordance with law." 52 U.S.C. § 30109(a)(8)(C); 5 U.S.C. § 706(2)(A). Yet to make this determination, a court necessarily must subject the Commission's exercise of discretion to judicial review, which it cannot do. That is enough to reject CREW's argument, but two other dispositive points deserve mention. While insisting that the Commission's discretionary decisions not to prosecute are *per se* "contrary to law," CREW never identifies what "law" it has in mind. For the reasons already given, the "law" cannot be

FECA. And it cannot be the APA.[8] CREW's argument also flies in the face of *Chaney*'s holding that § 701(a)(2) bars judicial review when there is no "law" to apply in judging how and when an agency should exercise its discretion, 470 U.S. at 830.[9] *See also Overton Park*, 401 U.S. at 410; *Webster v. Doe*, 486 U.S. at 600; *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993).

Before we end this opinion, several additional subjects need to be addressed. The district court held that an agency's "absolute discretion" to decide whether to bring an enforcement action will be sustained unless the petitioner shows that the Commission abused its discretion. *Citizens for Responsibility and Ethics in Washington*, 236 F. Supp. 3d at 391. Both Commission counsel and CREW have accepted the district court's formulation. We do not. The district court's statement of law is inconsistent with the precedents of this court and of the Supreme Court. Our duty in conducting *de novo* review on appeal is to resolve the questions of law this case presents. *See Elder v. Holloway*, 510 U.S. 510, 516 (1994). "When an issue or claim is properly before the court, the court is not limited to

---

[8] One might suppose that under § 701(a)(2), an agency's exercise of prosecutorial discretion merely renders the APA inapplicable. But our decisions hold that even if the APA is out of the picture, an agency's prosecutorial discretion is still presumptively immune from judicial review. *See Steenholdt v. FAA*, 314 F.3d 633, 638–39 (D.C. Cir. 2003); *Twentymile Coal Co.*, 456 F.3d at 160.

[9] *Chaney* left open the possibility that an agency nonenforcement decision may be reviewed if "the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Chaney*, 410 U.S. at 833 n.4 (citing *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (en banc)). CREW cites this footnote but its own submissions show that the Commission routinely enforces the election law violations alleged in CREW's administrative complaint.

the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991); *see also U.S. National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439, 446 (1993).

The district court's statement embodies a contradiction: as the court put it, an agency has "absolute discretion" when it comes to enforcement decisions, but it is up to the court to decide whether the agency abused its absolute discretion. The Court in *Chaney* took notice of the same ostensible contradiction between the "abuse of discretion" standard in APA § 706 and § 701(a)(2)'s bar against review to the extent the action is "committed to agency discretion." The Court then resolved the conflict on this basis: "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Chaney*, 470 U.S. at 830.[10]

Following *Chaney*, this court has held that if an action is committed to the agency's discretion under APA § 701(a)(2)—as agency enforcement decisions are—there can be no judicial review for abuse of discretion, or otherwise. Examples include *Drake v. FAA*, 291 F.3d 59, 69–72 (D.C. Cir. 2002); *Steenholdt v. FAA*, 314 F.3d 633, 638–39 (D.C. Cir. 2003); *Secretary of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006); *Association of Irritated Residents v.*

---

[10] Justice Scalia, dissenting in *Webster v. Doe*, 486 U.S. at 609–10, offered a more detailed explanation of the "seeming contradiction" between § 701(a)(2) and § 706. A unanimous Supreme Court later endorsed Justice Scalia's explanation. *Lincoln v. Vigil*, 508 U.S. at 191.

*EPA*, 494 F.3d 1027, 1031–33 (D.C. Cir. 2007); and *Sierra Club v. Jackson*, 648 F.3d 848, 855–56 (D.C. Cir. 2011).

The upshot is that agency enforcement decisions, to the extent they are committed to agency discretion,[11] are not subject to judicial review for abuse of discretion. It follows that CREW is not entitled to have the court evaluate for abuse of discretion the individual considerations the controlling Commissioners gave in support of their vote not to initiate enforcement proceedings.

The dissent goes off in a different direction, one that neither CREW nor the Commission ever argued. As the dissent sees it, the controlling Commissioners must have rendered an interpretation—or rather, a misinterpretation—of "political committee" as used in FECA.[12] The vote of these Commissioners had that effect because, according to the dissent, each Commissioner is obliged to issue or join an opinion reaching the merits before the Commission may, in the exercise of its prosecutorial discretion, dismiss a complaint to avoid

---

[11] The interpretation an agency gives to a statute is not committed to the agency's unreviewable discretion. *See Chaney*, 470 U.S. at 833 n.4; *Akins*, 524 U.S. at 26. Thus, if the Commission declines to bring an enforcement action on the basis of its interpretation of FECA, the Commission's decision is subject to judicial review to determine whether it is "contrary to law." *See FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27 (1981). This is what the Court meant in *Akins* when it wrote that although "an agency's decision not to undertake an enforcement action" is "generally not subject to judicial review," there may be such review under FECA if—as in *Akins*, *see* note 6 *supra*—the agency's action was based entirely on its interpretation of the statute. *Akins*, 524 U.S. at 26.

[12] *See* 52 U.S.C. § 30101(4)(A); *Buckley v. Valeo*, 424 U.S. 1, 79 (1976).

reaching the merits. Dis. Op. 13–17. The dissent's position contradicts the record, which is doubtless why neither party mentioned it.[13] But even if some statutory interpretation could be teased out of the Commissioners' statement of reasons, the dissent would still be mistaken in subjecting the dismissal of CREW's complaint to judicial review. The law of this circuit "rejects the notion of carving reviewable legal rulings out from the middle of non-reviewable actions." *Crowley Caribbean Transport, Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994); *see also Association of Civilian Technicians, Inc. v. Federal Labor Relations Authority*, 283 F.3d 339, 343–44 (D.C. Cir. 2002). In so holding, we followed the Supreme Court's decisions in *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 282–83 (1987), and *Chaney*, 470 U.S. at 827–28. (The agency in *Chaney* had determined that it lacked jurisdiction but that even if it had enforcement jurisdiction it would not exercise it. 470 U.S. at 824–25.) As to this firmly-established principle, the dissent has nothing to say. This is odd because the principle, as applied to this case, renders the dissent's novel theory superfluous.

*Affirmed.*

---

[13] These Commissioners explained that they had "concluded that any conciliation effort would be futile, and the most prudent course was to close the file consistent with the Commission's exercise of its discretion in similar matters" (citing *Heckler v. Chaney*, 470 U.S. at 832, quoted in note 7 *supra* and setting forth many reasons for an agency's declining to bring an enforcement action).

PILLARD, *Circuit Judge*, *dissenting*:

Voters have the right to know who contributes—and how much—to the campaigns of federal office-seekers. That right is only as effective as the agency that enforces it.

Congress enacted the Federal Election Campaign Act (FECA or Act), 52 U.S.C. §§ 30101 *et seq.*, to prevent money from corrupting or appearing to corrupt candidates' positions and actions in office. *See generally Citizens United v. FEC*, 558 U.S. 310, 371 (2010). FECA, in turn, makes the Federal Election Commission (FEC, Commission, or agency) the primary protector of voters' entitlement to "information 'as to where political campaign money comes from and how it is spent by the candidate.'" *Buckley v. Valeo*, 424 U.S. 1, 66-67 (1976) (quoting H.R. Rep. No. 92-564, at 4 (1971)).

But the Commission's partisan-balanced composition and the political nature of the matters it regulates raise risks of inaction. Congress wanted to prevent the agency's frequent deadlock from sweeping under the rug serious campaign finance violations—turning a blind eye to illegal uses of money in politics, and burying information the public has a right to know. To that end, Congress provided for judicial review of Commission decisions not to enforce FECA.

Thus, the Act retains its bite by calling on the Commission to address complaints through a series of judicially reviewable legal determinations in sequential votes on whether there is "reason to believe," and then "probable cause to believe," that campaign finance violations occurred. 52 U.S.C. §§ 30109(a)(2), (a)(4)(A)(i). If the Commissioners deadlock on a vote and, consequently, dismiss the matter, the Commissioners who vote not to proceed (Controlling Commissioners) must explain their reasons. *FEC v. Nat'l Republican Sen. Comm.*, 966 F.2d 1471, 1474 (D.C. Cir. 1992); *Common Cause v. FEC*, 842 F.2d 436, 448-49 (D.C. Cir. 1988); *Democratic Cong.*

*Campaign Comm. v. FEC*, 831 F.2d 1131, 1135 & n.5 (D.C. Cir. 1987). When the Commission dismisses all or part of a complaint, a complainant who believes it did so in error may file a petition in the U.S. District Court for the District of Columbia. 52 U.S.C. § 30109(a)(8)(A). Courts routinely review such dismissals. *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. FEC*, 209 F. Supp. 3d. 77 (D.D.C. 2016). They may declare that the Commission acted "contrary to law," and direct the Commission to conform to that declaration. 52 U.S.C § 30109(a)(8)(C). If the Commission fails to conform to the court's order within thirty days, the statute does not force the agency's hand; rather, it permits the complainant to bring a civil action in its own name to remedy the claimed violation. *Id.*

My disagreement with my colleagues is, at its core, specific to this case—we see the facts differently. My colleagues do not believe that the Commission made any legal decision, so *a fortiori* they see nothing "contrary to law" and no reason to remand. But the Commissioners voted on a legal recommendation by the General Counsel and explained their rejection of that recommendation: According to the Controlling Commissioners, the facts did not add up to legal "reason to believe" that the investigated organization—the Commission for Hope, Growth & Opportunity (CHGO)—may have operated as a "political committee." Because it was, in my view, clearly contrary to FECA to find no "reason to believe" on these facts, I would reverse the district court's grant of summary judgment and remand to the Commission. I believe that it is evident from the Controlling Commissioners' finding and reasoning that their dismissal of CHGO's case depended materially on an erroneous legal view of the organization's political-committee status. If, as my colleagues think, the Commissioners did not base their dismissal on a legal

interpretation, the agency could readily explain as much on remand.

The majority also makes a broader legal error not teed up by any party. The FEC, defending its action as legally correct and reasonable, nevertheless acknowledged that "Commission decisions not to prosecute, unlike those of most agencies, remain subject to judicial review." FEC Br. 27. The majority, unbidden, departs from that well-established principle. Because this case, properly understood, is an unremarkable subject for judicial review under settled law, I spell out the nature of my disagreement. The court's energetic defense of the FEC's enforcement discretion in rejecting Citizens for Responsibility and Ethics in Washington (CREW)'s particular theory of this case should not be taken to foreclose judicial review in similar cases in the future.

Starting with a few key points of agreement will help to clarify where we differ:

*First*, as the court acknowledges, and in keeping with our precedent, "[t]he interpretation an agency gives to a statute is not committed to the agency's unreviewable discretion." Maj. Op. 11 n.11. So, when "the Commission declines to bring an enforcement action on the basis of its interpretation of FECA, the Commission's decision is subject to judicial review." *Id*.; *see id.* at 7. Even as my colleagues rely on *Heckler v. Chaney*, 470 U.S. 821 (1985), they note that *Heckler*'s brand of unreviewability is inapplicable "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Maj. Op. 7 (quoting *Heckler*, 470 U.S. at 833).

*Second*, when the FEC is deadlocked, the Controlling Commissioners must issue a statement of reasons explaining their votes, and we, the reviewing court, look to that statement

to assess the lawfulness of the dismissal. *See* Maj. Op. 4; *Common Cause*, 842 F.2d at 449; *Democratic Cong. Campaign Comm.*, 831 F.2d at 1135 & n.5.

*Third*, when we discern legal error, we should remand to allow the FEC to decide how to conform. "[I]t is possible that even had the FEC agreed with [the correct] view of the law, it would still have decided in the exercise of its discretion not to" pursue enforcement. *FEC v. Akins*, 524 U.S. 11, 25 (1998). But because "we cannot know that the FEC would have exercised its prosecutorial discretion in this way," remand is the appropriate course. *Id.*

I read the Commissioners as having dismissed the case based on a legally erroneous view of the law. I believe we have an obligation to review that decision, identify the error, and remand to the Commission either to conform to the court's declaration, or to let CREW pursue the case through a private right of action.

The majority, however, like the district court, sees no legal error because it assumes that the Commission took "no stance" on whether there was reason to believe that CHGO operated as a political committee. *Citizens for Responsibility & Ethics in Wash. v. FEC*, 236 F. Supp. 3d 378, 394 (D.D.C. 2017); *see* Maj. Op. 4-5. Indeed, CREW invites that reading to the extent that it suggests the FEC somehow sidestepped making a no "reason to believe" determination and dismissed "based solely on a choice to preserve its resources." Appellant's Br. 31; *see id.* at 26 (charging the district court's approach as producing the "absurd" result of barring citizen suits "where the FEC *does not reach the merits* but dismisses based on its prosecutorial discretion") (emphasis added).

But the majority takes an unwarranted and incorrect further step, parting ways with the parties and the district court,

by finding the Commission's dismissal of the complaint to be entirely *unreviewable* under *Heckler*, 470 U.S. 821. *Compare* Maj. Op. 7, *with Citizens for Responsibility & Ethics in Wash.*, 236 F. Supp. 3d at 390 ("When the FEC exercises prosecutorial discretion, its controlling statement of reasons must be sufficiently detailed so as to allow a reviewing court to determine why the controlling commissioners decided to forego prosecution."); FEC Br. 27 ("Commission decisions not to prosecute, unlike those of most agencies, remain subject to judicial review."); Appellant's Br. 21 ("The standard for judicial review under the FECA is whether the dismissal was 'contrary to law.'").

In my view, the Commission's dismissal of the complaint was based on legal error and is reviewable on that ground. Per Section 30109(a)(2), the Commission took a statutorily defined action in response to the complaint and the General Counsel's report: an up-or-down vote on whether there was "reason to believe" that CHGO had violated FECA. It was at this stage that the three Controlling Commissioners voted that there was no "reason to believe." The Controlling Commissioners concluded *both* (a) that the information before them "did not definitely resolve whether there was reason to believe CHGO was a political committee," *and* (b) that, because the claims were also growing stale and CHGO was defunct, the case was not worth the FEC's effort. Joint App'x (J.A.) 769. The dismissal that the majority reads as based on reasons entirely unrelated to the strength of the evidence against CHGO appears on its face to have rested on the Controlling Commissioners' antecedent legal conclusion that the record as it stood failed to show "reason to believe" a FECA violation occurred. J.A. 757, 769. That conclusion can only be seen as "contrary to law." 52 U.S.C. § 30108(a)(9)(C).

More fundamentally and importantly, any FEC dismissal based on a no "reason to believe" vote is reviewable to the extent that such determination was contrary to law. The way my colleagues avoid recognizing the legal constraints on the Commission is to skip over the several steps that the Act spells out for the FEC. *See* 52 U.S.C. § 30109(a)(2)-(4). Instead, they analyze the Controlling Commissioners' dismissal as if it were a different kind of non-enforcement altogether: an unconstrained choice, under a different provision of the Act, which becomes relevant only after the FEC has passed through various defined steps. *See id.* § 30109(a)(6)(A). Viewing the case through that lens, the majority sees it as "obvious," that "the word 'may'" in that section of the Act "imposes no constraints on the Commission's judgment about whether, in a particular matter, it should bring an enforcement action." Maj. Op. 7. But this case stalled out on an earlier statutory threshold—a no "reason to believe" vote. *See* 52 U.S.C. § 30109(a)(2). The law is clear that, at that earlier stage, the agency does not have wholly unfettered—or unreviewable— choice as to how it proceeds. *See* Federal Election Commission, *Guidebook for Complainants and Respondents of the FEC Enforcement Process* at 12 (May 2012), http://fec.gov/em/respondent_guide.pdf (*FEC Process Guidebook*) (setting out Commissioners' three choices at that stage: find reason to believe, exercise prosecutorial discretion by an affirmative vote of four Commissioners not to proceed, or find no reason to believe).

The Supreme Court and this court have acknowledged that FECA channels the agency's exercise of prosecutorial discretion at various decisional stages. Arguing against judicial redressability in *FEC v. Akins*, the FEC there, like the majority here, contended that its dismissal of the complaint at issue lay in "an area generally not subject to review." 524 U.S. at 26. But the Supreme Court rejected that stance: It made

clear that, while "*Heckler* . . . noted that agency enforcement decisions have traditionally been committed to agency discretion, . . . [w]e deal here with a statute that explicitly indicates the contrary." *Id.* (internal citations, quotation marks, and alterations omitted).  In so holding, the Supreme Court sustained the understanding of this court sitting *en banc*.  We, too, had expressly distinguished *Heckler*, describing FECA as having "an unusual statutory provision which permits a complainant to bring to federal court an agency's refusal to institute enforcement proceedings challenging the Commission's interpretation of the term 'political committee.'"  *Akins v. FEC*, 101 F.3d 731, 738 (D.C. Cir. 1996) (en banc) (citations omitted); *see Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir 1986).

The FEC enjoys considerable discretion.  It has discretion in promulgating regulations and policies to effectuate the statutory provisions governing campaign finance.  It has discretion in how it reasonably applies those rules to the facts of the cases that come before it.  And, where it finds violations, it has discretion to decide whether, at the end of the day, to file suit.  *See* 52 U.S.C. § 30109(a)(6)(A); Maj. Op. 7.  But the agency's discretion is less than absolute at several points, including the one at issue in this case.  When the agency votes on whether there is "reason to believe" that a violation of FECA has occurred, it must give reasons for that action that are subject to judicial review.  *See* U.S.C. § 30109(a)(2)-(4).  Given everything that was not before us in this case (due to the mismatch between the opinion and what was briefed), today's majority should not be read to shut down that review.

## I. The Federal Election Commission Acted Contrary to Law

The FEC came to consider the case of the Commission on Hope, Growth and Opportunity when it received a complaint alleging that the organization, which registered as a 501(c) non-profit, was operating as a fly-by-night political committee, in contravention of FECA. The FEC General Counsel recommended that the Commission find reason to believe that CHGO was a political committee that violated its obligations under the Act.

### A. The Federal Election Campaign Act Supplies Law to Apply

Since its enactment in 1972 and amendment in 1974, FECA has promoted transparency of funding in federal elections. *See McConnell v. FEC*, 540 U.S. 93, 117-19 (2003). The law requires, for example, "[e]very person" who engages in independent campaign-related expenditures to make certain disclosures and disclaimers. *See* 52 U.S.C. § 30104(c)(1), (f)(1); *see generally Citizens United*, 558 U.S. at 366-71. Groups acting as "political committees" must make "similar" disclosures and disclaimers. *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010); *see* Supplemental Explanation & Justification, *Political Committee Status*, 72 Fed. Reg. 5595, 5596 (Feb. 7, 2007) (*2007 E&J*). Any such group must also register and keep records of its contributions, and disclose donors of more than $200. 52 U.S.C. § 30104(b)(3); *see id.* §§ 30103-30104.

FECA defines as a "political committee" any organization that receives or spends more than $1,000 annually, *id.* § 30101(4)(A); *see id.* §§ (8)(A), (9)(A), and has a "major purpose" of nominating or electing federal candidates, *2007 E&J*, 72 Fed. Reg. at 5601, 5605. In applying the so-called

"major purpose test," the agency is committed to a "fact-intensive inquiry" into each group's "overall conduct." *2007 E&J* at 5601-02, 5605; *id.* at 5597; *see also Shays v. FEC*, 511 F. Supp. 2d 19, 24 (D.D.C. 2007) (*Shays II*); *id.* at 31 (referring to political committee status is a "legal issue" that is "multifaceted"). The test requires the Commission to examine direct and indirect evidence of purpose, including the organization's "public statements" and "organizational statements of purpose," together with its "contribution[s] and "expenditure[s]" related to "federal campaign activity." *2007 E&J*, 72 Fed. Reg. at 5595, 5597, 5601, 5605. The FEC looks to how the group's overall "campaign activities compare[] to its activities unrelated to campaigns." *Id.* at 5601-02; *see Shays II*, 511 F. Supp. 2d at 30; *see also Free Speech v. FEC*, 720 F.3d 788, 798 (10th Cir. 2013); *Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 556-57 (4th Cir. 2012); *Citizens for Responsibility & Ethics in Wash.*, 209 F. Supp. 3d. at 93.

The fact that the Commission makes its legal determinations in the form of a "reason to believe" or "probable cause" inquiry does not place such actions among "those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). Neither does the fact-intensive character of those determinations make them non-legal. A decision that there is no "reason to believe" that an entity is a political committee is no less a determination of law—and no less subject to judicial review—than a simple determination that it is *not* a political committee. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996) (holding that "determinations of reasonable suspicion and probable cause should be reviewed *de novo*"). Courts routinely review no "reason to believe" dismissals. *See, e.g.*, *Common Cause*, 842 F.2d at 449; *Democratic Cong. Campaign Comm.*, 831 F.2d at 1133; *Citizens for Responsibility & Ethics in Wash*, 209 F.

Supp. 3d. 77. And we have expressly "decline[d] . . . to distinguish deadlock dismissals which run contrary to General Counsel recommendations based on clear legal precedent and [those that run contrary to] General Counsel's less definitive assessment of what the law requires in light of the factual allegations in the case." *Common Cause*, 842 F.2d at 449.

It is beyond debate that Congress, in enacting FECA, supplied meaningful standards against which it expected courts to evaluate the Commission's no "reason to believe" dismissals.

### B. The Facts the FEC General Counsel Uncovered About CHGO Provide "Reason to Believe"

The following facts about the Commission on Hope, Growth and Opportunity, as reported by the FEC General Counsel, are largely undisputed. *Citizens for Responsibility & Ethics in Wash.*, 236 F. Supp. 3d at 384.

For an organization that apparently had no records retention policy, *see* J.A. 551, the direct evidence here was telling. In planning documents, CHGO declared its goal to "make a measurable impact on the election outcome in selectively identified Senate races," J.A. 520, "us[ing] express advocacy in targeted Senate races," J.A. 514, and "focusing on . . . key districts to support the election of Republican candidates," J.A. 578; *see generally* J.A. 514-15, 652. The FEC General Counsel meanwhile found *no* documents "reflect[ing] that CHGO's purpose was, as it claimed [in its filings before the FEC], solely to educate the public on matters of economic policy formulation." J.A. 653.

Other evidence supplied yet more reason to suspect that CHGO was concealing its true nature. In response to questioning from the FEC, CHGO's general counsel

represented that he had "no relevant information or records" and "did not know who would have that information" in spite of repeated notices, previously sent by the Commission, instructing the organization to "preserve records . . . as required by law." J.A. 644 & n.9. When the FEC tried to subpoena a vendor CHGO had identified as producing non-campaign-related communications, the putative vendor's offices were vacant. J.A. 505. No such vendor had "[]ever rented [that] office space." J.A. 505. Instead, the tenant was a well-known political strategist. J.A. 505.

What is more, the people CHGO named in its IRS filings as its leadership denied to the FEC General Counsel having any real authority over CHGO's actions; and the people they identified as really running the show were political operatives. *See* J.A. 493-94, 546-52, 808-09. The man listed on CHGO's tax filings as its President and Executive Director told investigators that he had "been associated" with the group but had not exercised control over its activities. J.A. 493-94, 809. He said he was just the "creative person" and described his job as "plac[ing] . . . TV ads." J.A. 493-94, 547. The man listed as CHGO's Treasurer in its IRS application for tax-exempt status, J.A.794, reported that he handled some "accounting and tax work" for CHGO, but "probably" never interacted with the organization's putative president, J.A. 496. CHGO's general counsel, meanwhile, said he "just handled compliance issues" and disavowed any role in reviewing or preparing documents relating to the "funding, production or placement" of advertisements CHGO ran. J.A. 500-01, 555. This lawyer reported that he "did not know" who was in charge. J.A. 501.

Looking also at the organization's balance sheet for insight into its major purpose, the FEC General Counsel was able to confirm that a significant majority—at minimum 61 percent—of the organization's expenditures went to federal election

related communications. J.A. 737. "[O]ne thing is clear," wrote the General Counsel, "a definite majority of CHGO's spending was on activities that reflect the major purpose of influencing federal elections." J.A. 738.

Putting that 61 percent expenditure figure together with the direct and other circumstantial evidence, the General Counsel recommended that the Commission find "reason to believe" that CHGO may have been a political committee.

## C. The Federal Election Commission's Legal Error at the "Reason to Believe" Stage

FECA calls on the FEC Commissioners to vote, based on the recommendation of the General Counsel, as to whether there is "reason to believe that a person has committed, or is about to commit, a violation of th[e] Act." 52 U.S.C. § 30109(a)(2); *see FEC Process Guidebook* at 12. The Controlling Commissioners here voted that there was no "reason to believe" that CHGO was a political committee and issued a statement of reasons. J.A. 757-58.

That statement makes clear that the Controlling Commissioners, in evaluating the strength of the claim against CHGO, did not correctly apply the Commission's own "major purpose" test. They did not consider the organization's direct statements that CHGO had a "goal" of affecting federal races, the conduct of CHGO's leadership, or the overwhelming suggestions that everyone involved was trying to hide something. Ignoring that direct and circumstantial evidence runs contrary to the FEC's rule, *see 2007 E&J* at 5595-97, as well as the precedent that the Controlling Commissioners cited for support, J.A. 768 & n.13 (Statement of Reasons of Chairman Lee E. Goodman and Commissioners Caroline C. Hunter and Matthew S. Peterson, MUR 6538 (Americans for Job Security) (analyzing organizational statements in

determining major purpose) (*AJS Statement*)); J.A. 769 & n.17. Even looking only to the balance sheet, the Commissioners' conclusion—that 61 percent of total spending on express advocacy for federal candidates did not evince a "major purpose"—runs counter to FEC precedent and applicable law. *See, e.g.*, *AJS Statement* at 12; *compare* J.A. 769 n.16 (suggesting that certain commission payments to political strategists might raise "novel" legal issues), *with* 11 C.F.R. § 100.111(a) (counting as a relevant expenditure "any purchase, payment, distribution, loan . . . , advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office").

Informed by their fundamentally flawed "major purpose" analysis, the Controlling Commissioners reasoned that any violations of FECA's political-committee requirements were not "obvious" and that "the information learned during [the investigation] did not definitely resolve whether there was reason to believe CHGO was a political committee . . . ." J.A. 769. In fact, there was no reason to believe anything else.

## II. This Case is Subject to Judicial Review under the Federal Election Campaign Act

The court today declares the unreviewability of the FEC's dismissal. My colleagues see no "law" that the Controlling Commissioners could have contravened (and, admittedly, CREW was less than crystalline on the point). *See* Maj. Op. 8. But the law itself is clear: After receiving a complaint and a General Counsel report recommending further proceedings (or not), the Commission votes on whether there is "reason to believe" that a violation of FECA has occurred. *See* 52 U.S.C. § 30109(a)(2); *FEC Process Guidebook*, at 12-13. In cases in which the Commissioners find no reason to believe and dismiss the complaint, they must explain the basis of their action to

enable judicial review.  *See Common Cause*, 842 F.2d at 449; *Democratic Cong. Campaign Comm*, 831 F.2d at 1135 & n.5.

The Commission's action dismissing a complaint in those circumstances is "contrary to law" when it is based on a failure to faithfully apply FECA to the facts.  *See* 52 US.C. § 30109(a)(8)(C).  FECA provides that, "[i]f the Commission . . . determines . . . that it has reason to believe that a person has committed . . . a violation of [FECA]," such as by unlawfully operating as a political committee, "the Commission shall" provide notice and "shall make an investigation." *Id.* § 30109(a)(2).  If, when considering whether there is "reason to believe" that an organization operates as a political committee, the Commission does not evaluate the organization's "major purpose" as shown by its "overall conduct"—including "public statements," "internal documents," official filings, and "expenditures," *2007 E&J*, 72 Fed. Reg. at 5597, 5605—then the Commission has acted contrary to law.

Here, the Commission voted on whether there was "reason to believe" that CHGO was a political committee.  J.A. 757. Totality-of-the-circumstances decisions whether there is reason to believe a group may have been a political committee are reviewed as questions of law.  The Controlling Commissioners answered the "reason to believe" question in the negative—voting that there was no "reason to believe" that CHGO may have been a political committee and dismissing the case—because they thought the evidence was insufficient to "resolve" the question.  J.A. 757, 769.  On this record, that result cannot be squared with the law.

Where the FEC makes a determination about the law in finding no "reason to believe," we may review the dismissal. In *FEC v. Akins*, the Supreme Court rejected the notion that the

FEC's dismissal of a complaint upon a finding of no "probable cause to believe" that the organization at issue was a political committee would be an unreviewable exercise of enforcement discretion, so unredressable. 524 U.S. at 25-26. "We deal here," the Court wrote, "with a statute that explicitly indicates the contrary." *Id.* at 26. Far from "committing" FEC non-enforcement decisions to the agency's discretion, the FECA requires the agency to take certain steps where there is "reason to believe" a violation has occurred. *See* 52 U.S.C. § 30109(a)(2). And it establishes judicial review of dismissals. 52 U.S.C. § 30109(a)(8)(A). The Act provides that "[a]ny party aggrieved by an order of the Commission dismissing a complaint filed by such party . . . may file a petition with the United States District Court for the District of Columbia." *Id.* Further, "the court may declare that the dismissal of the complaint or the failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days, failing which the complainant may bring . . . a civil action to remedy the violation involved in the original complaint." *Id.* § 30109(a)(8)(C).

In a series of decisions, we have explained the importance of this judicial check. In *Democratic Congressional Campaign Committee v. FEC*, we held that FECA's "judicial review prescription" calls for review of an FEC dismissal that is, as here, "due to a deadlock"—that is, a three-to-three tie vote by the Commissioners. 831 F.2d at 1133. In so doing, this court expressly rejected the FEC's argument, "citing *Heckler v. Chaney*, that deadlocks on the Commission are immunized from judicial review because they are simply exercises of prosecutorial discretion" rather than legal determinations whether there is "reason to believe." *Id.* This court instead suggested that FECA calls for judicial review: "[W]here the Commission is unable or unwilling to apply settled law to clear facts, judicial intervention serves as a necessary check against

arbitrariness." *Id.* at 1135 n.5 (internal quotation marks omitted).

The next year, in *Common Cause v. FEC*, 842 F.2d 436, we reaffirmed the crucial role of judicial review in FECA's scheme. The Commission there had dismissed a complaint via deadlocked vote, contrary to the General Counsel's recommendation to find "reason to believe." We held that the Act requires the FEC to provide a statement of reasons even where the implicated questions of campaign finance are unsettled or fact-intensive; such a statement is necessary "to allow meaningful judicial review of the Commission's decision not to proceed." *Id.* at 449. Judicial review ensures that the agency does not, by unlawfully dismissing complaints, frustrate the statutory scheme and undermine enforcement.

So, too, here, the Commission's decision to dismiss as a result of the deadlocked "reason to believe" vote is not a matter "committed to agency discretion" under FECA. There is a strong presumption that agency action is reviewable. *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967); *see also Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 410. *Heckler* is the exception, and its "non-reviewability only applies where the governing statute's enforcement provision describes the agency's role as discretionary." *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1032 (D.C. Cir. 2007). The Supreme Court, in *Heckler*, acknowledged reviewability of non-enforcement where the relevant statute constrains the agency's discretion. 470 U.S. at 833-34. The Court in *Heckler* distinguished *Dunlop v. Bachowski*, 421 U.S. 560 (1975), where the statute directed the Secretary to investigate complaints and provided that "if he finds probable cause to believe that a violation . . . has occurred . . . he shall" pursue enforcement. *Heckler*, 470 U.S. 833-34 (alterations in original) (quoting 29 U.S.C. § 482(b)); *see also Dunlop*, 421 U.S. at 562-

63 & n.2.  Where the Secretary declined to proceed through the defined statutory checkpoint, "'the principle of absolute prosecutorial discretion' [was] inapplicable."  *Id*. at 834 (quoting *Bachowski v. Brennan*, 502 F.2d 79, 87 (3d Cir. 1974)).

As was the case in *Dunlop*, the FECA provision at issue here provides law for the agency and the court to apply, and calls for judicial review of dismissals.  *See supra* Part I.A.  After it receives a General Counsel recommendation regarding a complaint, the agency votes on whether there is "reason to believe" that a violation of FECA may have occurred.  *See* 52 U.S.C. § 30109(a)(2); *FEC Process Guidebook*, at 12-13.  If there is reason to believe, the Commission must take further steps.  *See* 52 U.S.C. § 30109(a)(2)-(4); *FEC Process Guidebook*, at 12.  The Commission may depart from the General Counsel's recommendation to find "reason to believe," but it must explain any decision to do so.  *See Common Cause*, 842 F.2d at 449; *Democratic Cong. Campaign Comm.*, 831 F.2d at 1135 & n.5.  Judicial review ensures that, if the Commission erred in its reasoning—dismissing a matter under a faulty view of the law where there *is*, in fact, "reason to believe" that a violation may have occurred—the matter is remanded to the agency so that it may reconsider its decision.  *See Akins*, 470 U.S. at 25-26.

The statute elsewhere compensates in various ways for those curtailments of enforcement discretion.  If it chooses *not* to vote "yes" or "no" on "reason to believe," the Commission has a third option:  "Pursuant to an exercise of prosecutorial discretion, the Commission may dismiss a matter when, in the opinion of at least four Commissioners, the matter does not merit further use of Commission resources."  *FEC Process Guidebook* at 12.  If a court declares a Commission's dismissal to be "contrary to law," the statute contemplates that the

Commission may decline to act in accordance with that directive. 52 U.S.C. § 30109(a)(8)(C). The complainant may then sue in his or her own name to remedy the claimed violation. *Id.* As CREW observes, the Act's limited private right of action helps to prevent cooptation of agency resources. *Id.* Finally, if a complaint passes through all the prescribed checkpoints—from "reason to believe" to conciliation—the Commission enjoys ultimate non-enforcement discretion: It is the Commissioners' option whether to institute a civil action in court. *See* 52 U.S.C. § 30109(a)(6)(A).

As the Supreme Court explained in *Akins*—and the FEC confirmed at oral argument, Oral Arg. Rec. at 44:03-44:18—courts may review for legal error dismissals at FECA's defined steps. 524 U.S. at 26. Where the court finds legal error, the statute provides that the court should remand so that the Commissioners may reassess their action with a correct view of the law in mind: While "it is possible that even had the FEC agreed with [the correct] view of the law, it would still have decided in the exercise of its discretion not to" pursue enforcement, "we cannot know that the FEC would have exercised its prosecutorial discretion in this way." *Id.*

Here, as in *Akins*, we cannot know the counterfactual. We cannot be certain what the FEC would have done had it correctly applied the legal definition of political committee. In this case, all six commissioners voted to investigate the "obvious" violations of the requirement to disclose independent expenditures. If the Controlling Commissioners had not labored under a view of CHGO's political-committee status that was contrary to law, a majority might well have proceeded with that claim, too, as "obvious." J.A. 769.

The majority miscasts this case in the *Heckler* mold. CREW admittedly sidestepped any argument on the "reason to

believe" question—instead framing its case as a direct and wholesale challenge to the agency's enforcement discretion. So it is perhaps understandable that my colleagues turn to FECA Section 30109(a)(6)(A)'s separate provision granting the FEC discretion whether to file suit in federal court. The parties did not focus on, and the court leaves untouched, how the action the Commission took here—a vote keyed to a specific legal question, *i.e.*, "reason to believe"—calls for judicial review. I trust that, in future cases, the court will continue, consistent with existing law, to review legal determinations that the Commissioners make when they vote on the merits of "reason to believe" or "probable cause" questions, *see* 52 U.S.C. § 30109(a)(2)-(6); R. Sam Garrett, Cong. Res. Serv., *The Federal Election Commission: Enforcement Process and Selected Issues for Congress* 5-6 (Dec. 22, 2015) (citing 52 U.S.C. § 30109; *FEC Process Guidebook*), and that they will continue to explain their decisions, *see Common Cause*, 842 F.2d at 449; *Democratic Cong. Campaign Comm.*, 831 F.2d at 1135 & n.5. After all, these constraints reflect Congress's judgment that judicial review is required, in part, "to assure . . . that the Commission does not shirk its responsibility" to pass on the merits of complaints. *Democratic Cong. Campaign Comm.*, 831 F.2d at 1134 (quoting 125 Cong. Rec. 36,754 (1979)); *see id.* at 1135 & n.5.

My colleagues do not grapple with these questions—they remain for future cases. Instead, the court points to non-FECA decisions readily distinguishable from this one and to which no party cited. *E.g.* Maj. Op. 10-12 (citing *Ass'n of Irritated Residents*, 494 F.3d at 1032 (holding non-enforcement decision unreviewable where statute provided that Secretary "'may' take any number of enforcement actions"); *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 157-58 (D.C. Cir. 2006) (vacating Mining Commission's reversal of Labor Secretary's

citation of mine operator under statute that "provides no meaningful standard against which to judge the Secretary's decision regarding which party to cite"); *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir 2003) (denying review of agency's nonrenewal of petitioner's authorization under provision granting the Administrator authority to rescind such authorization "for any reason the Administrator considers appropriate" (quoting 49 U.S.C. § 44,702(d)(2)); *Drake v. FAA*, 291 F.3d 59, 69-72 (D.C. Cir 2002) (affirming agency dismissal of complaint without investigation under provision authorizing dismissal when Secretary "is *of the opinion* that the complaint does not . . . warrant investigation or action" (quoting 49 U.S.C. § 46,101(a)(3)) (emphasis in *Drake*)); *Sierra Club v. Jackson*, 648 F.3d 848, 856 (upholding agency inaction where the statute tasks the administrator to "take such measures . . . as necessary" but without "guidance . . . as to what action is 'necessary'"); *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 672, 676 (D.C. Cir. 1994) (reading *Heckler* to apply where "the relief sought by petitioner" was the initiation of a discretionary "enforcement action," but the Administrator did not view the complained-of conduct as properly within the statute).

The myriad statutes that permit largely unfettered, and therefore unreviewable, discretion do not speak to FECA. There can be no serious claim that FECA equates a "no reason to believe" vote to an exercise of unfettered enforcement discretion. To the contrary, the Act explicitly provides for judicial review of dismissals based on those votes. On *Heckler*'s own logic, then, FECA's constrained agency non-enforcement is judicially reviewable and, if contrary to law, subject to remand. *Heckler*, 470 U.S. at 833-34. It remains for us to conduct such review in future cases that warrant it.

### III. Conclusion

Under the correct standards, undeniable "reason to believe" that CHGO operated unlawfully as a political committee should have prompted further investigation and perhaps enforcement by the FEC. The court rests its decision today on its view that the FEC sidestepped the merits wholesale and exercised prosecutorial discretion untainted by an erroneous view of the law. Critically, the majority preserves judicial review where "the Commission declines to bring an enforcement action on the basis of its interpretation of FECA." Maj Op. 11 n.11. I think this is such a case. I read the Controlling Commissioners as having held a clear but incorrect view of the law that informed their dismissal. That decision should have been reviewed, reversed, and remanded to the FEC.

Absent argument from any party, my colleagues have reached out to suggest that any Commission dismissal guided by discretionary considerations is unreviewable. I have here explained why FECA's statutory scheme—and its various limitations on non-enforcement discretion—place cases like this one outside *Heckler*'s ambit. I believe that, in future cases where the parties tee up this issue, *Heckler* will not bar our review.

The end of CHGO's story remains a mystery. The group dissolved within several months of learning that it remained the subject of FEC investigation. Political operatives involved with the group exchanged frantic emails stating that it was urgent to "shut it down" and "[r]eally important . . . to get this terminated ASAP." J.A. 636. The organization lasted only one federal election cycle and managed to slip into the shadows without the scrutiny FECA requires. But the court's holding

today should not be mistaken to mean that other organizations may do the same.